***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Glenn, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or rehear the parties. Accordingly, the Full Commission affirms the Deputy Commissioner's Opinion and Award with certain modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. The Carriers on the risk for the defendant-employer in this claim were as follows; Fireman's Fund Insurance from 1983 through May 1, 2002, Royal and Sunalliance Insurance from May 1, 2002 through October 1, 2003, and The Travelers from October 1, 2003 to present.
3. An employment relationship existed between plaintiff and defendant-employer from January 1, 1984 until February 4, 2005.
4. The following exhibits were admitted into evidence at the hearing:
 a. stipulation #1, MSDS sheets;
 b. stipulation #2, air monitoring reports;
 c. stipulation #3, plaintiff's exhibits, which include IC forms, discovery and medical records (5,500 plus pages);
 d. defendant's #1, diagram of pre-treatment system;
 e. defendant's #2, diagram of 1st
floor;
 f. defendant's #3, diagram of paint room;
 g. defendant's #4, diagram of paint room;
 h. defendant's #5, diagram of paint room ventilation; *Page 3 
 i. defendant's #6, picture;
 j. defendant's #7, picture;
 k. defendant's #8, picture;
 l. defendant's #9, picture;
 m. defendant's #10, picture;
 n. defendant's #11, picture;
 o. defendant's #12, picture;
 p. defendant's #13, picture;
 q. defendant's #14, picture;
 r. defendant's #15, picture;
 s. defendant's #16, picture;
 t. defendant's #17, picture;
 u. defendant's #18, picture;
 v. defendant's #19, picture;
 w. defendant's #20, picture;
 x. defendant's #21, picture;
 y. defendant's #22, class on paint change;
 z. defendant's #23, picture;
 aa. defendant's #24, picture;
 bb. defendant's #25, picture;
 cc. defendant's #26, picture;
 dd. defendant's #27, chart of pre-treatment after non-chrome use;
 ee. defendant's #28, chart of prior to non-chrome paint; *Page 4 
 ff. defendant's #29, chart;
 gg. defendant's #30, description of paint room protective equipment;
 hh. defendant's #31, plaintiff's training record;
 ii. defendant's #32, plaintiff's certifications; and,
 jj. plaintiff's #1, OSHA small guide.
5. The Pre-Trial Agreement along with its attachments and any additional stipulations are hereby incorporated by reference as though they were fully set out herein.
 *********** EVIDENTIARY MATTERS
Defendants Stabilus and Travelers Insurance Company filed before the Deputy Commissioner a Motion in Limine to Exclude Exhibits and Related Testimony from Deborah Proctor's Deposition. Deborah Proctor is Defendants' witness and the exhibits Defendants seek to exclude are those submitted by Plaintiff on cross-examination, as well as the related testimony on cross-examination. The Motion in Limine is denied, as are the related objections by Defendants during Ms. Proctor's deposition. Ms. Proctor's testimony is allowed in full.
Prior to the hearing before the Full Commission, Defendants Stabilus and Travelers submitted a Motion to Admit NCIC Form 22. Plaintiff objected to the Motion as untimely and argued that Plaintiff should be allowed to cross-examine the preparer of the Form, as well as submit any additional wage information. The Motion is granted and the NCIC Form 22 is accepted into the record. However, additional evidence shall be taken in the manner ordered in the Award section below.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following: *Page 5 
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, the now-deceased Plaintiff-Employee (hereinafter Decedent-Employee) was 69 years old. Decedent-Employee grew up in Ohio, where she finished the 11th grade and eventually completed her GED by way of a home school course. Decedent-Employee smoked a pack of cigarettes per day beginning at age 17 and was still smoking at the time of the hearing before the Deputy Commissioner.
2. Prior to coming to work for Defendant-Employer, Decedent-Employee was employed by Spectrum in Kings Mountain, from 1971 to 1977, and by Homelite in Gastonia from 1978 through 1984. Decedent-Employee began working for Defendant-Employer at its Gastonia, North Carolina facility in 1984 and remained in that job until 2005. Decedent-Employee also worked a second job part-time at Kentucky Fried Chicken for approximately 22 years. Decedent-Employee was still working part-time at Kentucky Fried Chicken at the time of the hearing before the Deputy Commissioner.
3. Defendant-Employer Stabilus manufactures gas shocks (springs) for use in the automobile and transportation industry. After they are made, the springs are automatically conveyed through a series of pretreatment tanks to be cleaned and sprayed with various chemicals to prevent corrosion before finally being painted. This pre-treatment system consists of five stages. The first stage involves the application of a potassium hydroxide cleaning solution. The tank that fed that stage was a 1,775-gallon tank and contained 75 gallons, 4.2% by volume, of a potassium hydroxide solution called Betz Clean K-149, which was heated to 130° F. The second stage is a rinse cycle using unheated city water. The third stage in the process is another cleaning cycle involving the application of phosphoric acid and hydrofluoric acid from a 1,775-gallon tank. Of the 1,775-gallon tank, 55 gallons is a product called Permatreat 382. The *Page 6 
acid is 3% by volume of that tank, which is heated to 130° F. The fourth stage of the process consists of a second rinse with unheated city water. The final chemical treatment tank is a chrome sealant tank which sprays a solution containing hexavalant chromium on the springs. This solution was created by adding 900 milliliters of a product called Phosgard 748 to 420 gallons of unheated city water. Six to ten percent of Phosgard 748 is hexavalent chromium. Thereafter, the springs are blown off to remove excess chemicals and automatically conveyed to an oven for drying before being painted.
4. The springs next make their way to the paint room. This is the area where Decedent-Employee primarily worked. Defendant-Employer's current facility was constructed in 1985, approximately one year after Decedent-Employee began her employment, and she moved over to the new facility along with the company. Once the move was complete, according to Decedent-Employee, Defendant-Employer switched to a liquid paint that included hexavalent chromium. The paint booth is enclosed with the exception of approximately 60° of arc. Inside the booth, the spring shocks are sprayed via an electrostatic paint spraying disc. The paint consists of approximately equal parts of a hardener and paint with a matte black paint pigment, as well as a small amount of catalyst. Despite the efficiency of the electrostatic painting system, paint overspray occurred.
5. Decedent-Employee's primary job with Defendant-Employer was as a paint booth operator in the paint room. She also mixed the paint, titrated the chemicals in the pretreatment tanks, and cleaned the pretreatment tanks. As part of this work, Decedent-Employee was exposed to hexavalent chromium in the normal course of her employment with Defendant-Employer. *Page 7 
6. Decedent-Employee mixed the paint and chemicals in 5 gallon buckets. After the paint is poured into the 5-gallon bucket, it is stirred up by use of an automatic electrically operated mixer. A hose is then connected to the bucket and the system begins operating again. Normally, a bucket lasts 2 to 2-1/2 hours, but if the line is running double stacked hangers with shocks, the bucket will empty more quickly. The paint booth operates around 6 to 7 hours per day. Therefore, the paint buckets are refilled about 3 to 4 times per shift. On many occasions, however, only a single tier of shocks is run.
7. While the sprayer was painting the springs, Decedent-Employee would spend most of her time in the paint room. The paint booth operator must complete paperwork and charts in connection with the painting and does so at a work station in the paint room. According to the testimony of Decedent-Employee and former co-workers and supervisors offered as witnesses by Plaintiff, there was a paint mist in the air of the paint room and an overspray which coated the room. These witnesses included Dottie Blake, former paint line supervisor, Tony Bollinger, hazardous waste disposal, Brian Creed, printer operator/back-up paint booth operator, and Kimberly Spearman, lead on the paint line from 1986 to 1988. To keep down the overspray, the employees put paper around the paint booth. When the paper became very heavy with paint, they took the paper down and the dried paint would crack and create dust that would get into the air and onto their clothes and skin. Decedent-Employee performed this task from time to time, but Brian Creed, who ran the printers downstairs, performed the paper removal process 85% of the time. He testified that a fine black paint dust covered the paint room, though it did not show up in photographs of the room. Tony Bollinger testified that the paint booth paper was handled as hazardous waste and had to be boxed and bagged and disposed of in a certain manner due to its chromium content. Mr. Bollinger named three sources of chromium waste from the paint *Page 8 
process: paint overspray, paint dust from the Kraft paper, and paint ash from the oven that dried the springs after they were painted.
8. There is ventilation in the paint room that changed over the years. Michael Ellington, Facility Engineer at Defendant-Employer, testified that the ventilation in the paint room had been upgraded over the years in the hopes of improving it to remove the paint odor, but it had never been intended to remove particulate matter from the paint room air. Personal protective equipment was not required in the paint room and Decedent-Employee did not wear it.
9. Air quality testing was performed in the plant and paint room annually. Ventilation and industrial hygiene surveys were conducted throughout the plant from its inception in 1985 through the end of Ms. Blackburn's employment in 2005. The levels of hexavalent chromium were sampled on numerous occasions and all sampling showed it was "non-detectable" at the screening levels used by the industrial hygiene companies that performed the testing for Defendant-Employer.
10. The paint used by Defendant-Employer contained hexavalent chromium until Defendant-Employer changed to non-chromium paint in 2004. Hexavalent chromium is an odorless compound.
11. While Decedent-Employee was primarily a painter, she had to perform titrations on the pre-treatment tanks twice per shift. This involved checking the proportion of the various chemicals in the primary wash tank, the iron phosphate coating tank, and the chrome seal tank and adding more chemical or more water as needed. This included adding the hexavalent chromium solution, Phosgard 748, to the chrome seal tank.
12. In addition to titrations of the pre-treatment system tanks, Decedent-Employee was also required to clean the pre-treatment tanks that held the treatment solutions and the spray *Page 9 
vestibules in which the chemical solutions were sprayed onto the springs. When Blackburn initially started working for Defendant-Employer, the pretreatment system was cleaned every week. Over the years, the frequency decreased to once every two weeks as of 1995 or 1996 and to once a month by 2001. Decedent-Employee cleaned out the chrome seal tank and vestibule throughout her career. Although other employees cleaned the chrome seal vestibule and tank, Plaintiff was considered to be the most effective cleaner and was, therefore, most often asked to perform the task.
13. The chrome seal portion of the pre-treatment system, when in operation, is set up so that the solution is pumped out of its tank, through nozzles in the walls of the chrome seal vestibule onto the springs, and then drips down the walls or off the springs back into the tank which is open via a catwalk beneath the vestibule spraying section. Because of the hexavalent chromium content, the chrome seal tank is drained through a separate dedicated waste treatment system to a treatment area about 100 yards away. The tank will drain down to an inch or two above the bottom level of the tank because the drain extends above the bottom of the tank one to two inches. The remainder of the liquid in the tank below the level of the drain is wet-vacced out using a contained vacuum system that is pumped into a drum. Thereafter, the remaining residue is squeegied out by an operator. Cleaning the chrome seal vestibule involves changing out the 20 to 25 nozzles on the walls. They would be turned and removed and collected in a pail. The operator would then spray down the walls of the vestibule and connect clean spray nozzles onto their connection apparatus.
14. During the cleaning process, Decedent-Employee would wear a paper suit and paper mask. There was yellow liquid that dripped on and penetrated the suit and got her wet while spraying down the walls and ceiling of the chrome seal vestibule. There would also be a *Page 10 
fine mist or fog that would get all over her skin, hair and clothes. It would also get into her nose and throat, and she could taste the chromium solution. Decedent-Employee testified that she had to change paper suits two to three times a day during the cleaning process as they became saturated. Decedent-Employee testified that it would take her about an hour to clean the chrome seal tank and vestibule.
15. Defendant-Employer kept Material Safety Data Sheets (MSDS sheets) about the Phosgard 748 product used in the chrome seal tank. These sheets indicated that it contained chromic acid, which was highly toxic, and chromium chromate, a human carcinogen. The sheets warned against inhalation of dusts and mists from the product. The Phosgard product label stated that the solution contained hexavalent chromium, which was hazardous and was a human carcinogen. The label cautioned against skin or inhalation exposures. The MSDS sheets describe the color of the Phosgard 748 compound as dark brown, the Permatreat 382 used in the phosphate tank as colorless to yellow, and the Betz Kleen 149 used in the first cleaning process as amber. Mr. Creed testified that he did not know the concentration of chromium in the chrome seal tank solution, but stated that the Phosgard became a yellow color when it was mixed into the water in the chrome seal tank. He also stated that the water in the chrome seal tank was no longer yellow after the use of Phosgard and hexavalent chromium was phased out in 2004.
16. Defendants' witnesses, Robert Tierney, manager of environmental facilities, Tim Ballard, logistics/planning, and Michael Ellington, facility engineer, all agreed, to the extent of their knowledge, with the descriptions of the conditions of the paint room and the pre-treatment system cleaning process as testified to by Decedent-Employee, Dorothy Blake, Tony Bollinger, and Brian Creed. Mr. Tierney differed in that he described the stains on the paper suits worn in the chrome seal vestibule as brown instead of yellow. Mr. Tierney also stated that the suits were *Page 11 
Tyvek paper and meant to withstand some moisture. Mr. Ballard testified that employees were supposed to use a "respirator" when cleaning the tanks. However, Decedent-Employee testified that she was only ever provided with a paper mask.
17. Decedent-Employee began to have problems with chest pain, shortness of breath, and fatigue. She initially presented to her primary care doctor, Dr. Kanchan Dibert, in 2002 with complaints of coughing and wheezing. Dr. Dibert eventually referred her to Dr. Ifeyani Eruchalu, a pulmonologist.
18. Dr. Eruchalu first examined Plaintiff for shortness of breath and chronic obstructive pulmonary disease in October 2004. When a lung x-ray showed a mass, he performed a diagnostic bronchoscope that was unsuccessful. He referred Plaintiff to a surgeon for a biopsy.
19. On December 31, 2004, Dr. Kim Crosby, a general surgeon, performed a mediastinoscopy on Plaintiff but was also unable to make a diagnosis based on the pathology. Therefore, Decedent-Employee was referred to Duke University Medical Center for evaluation by Dr. David Harpole, Professor and Chief of General Thoracic Surgery.
20. Dr. Harpole performed a bronchoscope and diagnosed Decedent-Employee with lung cancer in early 2005. Dr. Harpole noted that Plaintiff had a significant smoking history, but also had an unusual occupational history of exposure to paint and chemicals and unusual pulmonary function testing (PFT) results. Plaintiff's subnormal PFT results and her diffusion capacity did not track each other, as they do in most smokers. Instead, her diffusion capacity was markedly lower, which is usually a marker for interstitial lung disease, often a result of occupational exposure. Dr. Harpole ordered a heavy metal blood screen which found elevated levels of chromium that were four times the normal level. Dr. Harpole had never had a patient *Page 12 
test at such an elevated level of chromium. Dr. Harpole removed the lower lobe of Plaintiff's right lung and several lymph nodes. The tumor found in the right lower lobe was a 9-centimeter adenocarcinoma mass with several satellite nodes. Plaintiff's cancer was unusual in that the satellite nodes were negative for cancer. Dr. Harpole explained that smoking-related cancers have usually started to spread by the time they reach that size. Dr. Harpole agreed that some of Plaintiff's interstitial disease could have been caused by smoking, but it was out of proportion for smoking to be the only cause. Her 30% diffusion capacity represented a "sick lung" and he could not explain that result other than to consider occupational exposure. On cross-examination, Dr. Harpole noted that smoking-related tumors usually occur in the upper lobes, though they do also occur in the lower lobes. Without more information and expertise in toxicology and epidemiology, Dr. Harpole could not opine as to causation with any degree of certainty. He did state that it was possible that Plaintiff's occupational chromium exposure caused or contributed to her cancer and remarked that there was an "interesting relationship" between her unusual clinical findings and her occupational exposure.
21. For her post-tumor removal treatment, Plaintiff presented to Dr. David Miller, oncologist and hematologist, on June 22, 2005. Dr. Miller managed Decedent-Employee's chemotherapy. He testified that her cancer had a high risk of recurrence due to the presence of satellite lesions. Her nodules began increasing at six months and he treated her with a growth inhibitor. He treated Decedent-Employee's lung tumor as a primary cancer.
22. Decedent-Employee ceased working at Defendant-Employer in February 2005 when she was diagnosed with lung cancer and underwent surgery to remove the tumor. Drs. Dibert and Eruchalu both testified that Decedent-Employee had a significant breathing impairment. Dr. Eruchalu testified that he would limit Decedent-Employee's work activity due *Page 13 
to dyspnea and that she could not be exposed to dust or chemicals. Dr. Dibert testified that he did not think that she could work at Defendant-Employer or perform any physical labor. He was aware of her then-ongoing part-time work at Kentucky Fried Chicken and did not believe she should be working there. However, he noted that she was "headstrong" and needed to work for the money. Both Drs. Dibert and Eruchalu recommended that Decedent-Employee use oxygen, but she declined because she associated it with death. Neither physician testified that Decedent-Employee would have been able to return to work if she had used oxygen.
23. Decedent-Employee died from an immediate cause of metastatic disease, carcinoma of the lung, on March 7, 2009. Kimberly Sue Phelps, her daughter, was substituted as Plaintiff in this matter by Order of George T. Glenn, II, Deputy Commissioner, on April 17, 2009. The Full Commission finds that Decedent-Employee was totally disabled from her last day of employment with Defendant-Employer until her date of death due to her lung cancer and related problems.
24. Plaintiff and Defendants presented the following expert witnesses on the issues of exposure and causation: Dr. Arthur Frank, Dr. David Schwartz, Dr. Max Costa, Dr. Janet Weiss, and Deborah Proctor. None of these witnesses examined Decedent-Employee.
25. Dr. Arthur Frank was offered as an expert witness by Plaintiff. Dr. Frank is board-certified in internal and occupational medicine and is currently Professor of Public Health and Chair of the Department of Environmental and Occupational Health at the Drexel University School of Public Health. About 10% of his work is litigation consulting, usually for plaintiffs, but sometimes for defendants. He testified that hexavalent chromium has been proven to cause lung cancer and primarily enters the body through inhalation. For this claim, he reviewed the MSDS sheets, work histories, a cover letter, lab results, medical records, and industrial hygiene *Page 14 
workplace measurements, including air sampling. He testified that he had adequate information to render an opinion and he opined that Decedent-Employee had a significant history of exposure to hexavalent chromium that was sufficient to lead to cancer. The type of cancer Decedent-Employee developed, adenocarcinoma, has been related to hexavalent chromium, whereas other kinds of cancer have not. Another cause of her cancer is cigarette smoking. He testified that he was not aware of any synergistic effect, but felt that both factors played a role in her cancer. The fact that the air sampling at Defendant-Employer was below OSHA's permissible exposure levels (PEL) did not affect his opinion because there were no records of exposure when she cleaned out the chrome seal vestibule and tank and OSHA's PEL is not necessarily a safe level. In his opinion, Decedent-Employee's employment caused her to have an increased risk of developing lung cancer than someone in the general population. The important factors in his consideration were her exposures to a known carcinogen, the lack of adequate respiratory protection, a sufficient latency period, and the right cell type cancer. In addition, her blood test results showed four times the normal level of chromium, which pointed to excessive exposure. Dr. Frank testified to a reasonable degree of medical certainty that Decedent-Employee's lung cancer was caused by smoking and hexavalent chromium exposure.
26. On cross-examination, Dr. Frank testified that he had not performed any research or published any papers focused on chromium and cancer, though he had mentioned it in papers on lung cancer and was familiar with review articles and book chapters on it. Dr. Frank testified that he was familiar with the literature indicating that there is a threshold effect for low exposures to hexavalent chromium and he was aware that hexavalent chromium could be metabolized into trivalent chromium in the lungs. However, he explained that neither of these issues affected the fact that hexavalent chromium is carcinogenic. Carcinogens themselves do *Page 15 
not have a threshold even if one can be shown epidemiologically. Moreover, not every molecule of hexavalent chromium would be metabolized and rendered into trivalent chromium. In sum, he did not believe that the level of exposure determined whether a substance could cause cancer. Dececdent-Employee's relative risk of cancer from hexavalent chromium may have been low, but it was not zero. Dr. Frank estimated that Decedent-Employee's 9-centimeter tumor had been growing for 10-12 years and disagreed that exposures in the last three years would not have contributed to the development of the cancer.
27. Dr. David Schwartz was offered as an expert witness by Plaintiff. He has been a physician scientist for 25 years. He is board-certified in internal, occupational, and pulmonary medicine. He was a Professor at the University of Iowa and then Duke University in medicine, genetics, and environmental sciences. He directed Duke's pulmonary critical care and allergy division before becoming Vice Chair of Medicine for Research. In 2005, Dr. Schwartz left Duke to be Director of the National Institute of Environmental Health Sciences (NIEHS) and the National Toxicology Program (NTP). He is now Professor at National Jewish Medical and Research Center and Director of its Pulmonary Allergy Critical Division and Center for Genetics and Therapeutics. Chrome or chromium is among the substances studied by the NTP. He currently oversees the clinical and research programs of about 50 doctors and 50 scientists. Toxicology has been part of his profession and he has also treated occupational cancer patients and overseen research on occupational cancer. For this case, Dr. Schwartz reviewed medical records and various information including air sampling reports. He determined that Decedent-Employee was exposed to hexavalent chromium among other agents while working for Defendant-Employer. He testified that hexavalent chromium is a carcinogen that can cause lung cancer. Decedent-Employee contracted the type of lung cancer caused by an agent such as *Page 16 
hexavalent chromium. He testified that, to a reasonable degree of medical certainty, her lung cancer was caused by exposure to cigarette smoke and hexavalent chromium. The important factors in his opinion were that Decedent-Employee worked as a painter with chromium-based paints, was diagnosed with lung cancer, and had chromium blood levels elevated several months after she stopped working. The air sampling did not affect his opinion. He explained that the OSHA PEL is not a guarantee of safety because it is a sampling at one point in time and is dependent on an average exposure. In his opinion, smoking would make Decedent-Employee more susceptible to damage or cancer from other carcinogens. Dr. Schwartz testified that if Decedent-Employee tasted the chromium in her mouth when cleaning in the tank, she was getting exposed to high levels of it. A paper dust mask would not protect her from vaporized chromium. Dr. Schwartz testified that, to a reasonable degree of medical certainty, Decedent-Employee's exposure to hexavalent chromium at Defendant-Employer would have increased her risk of developing lung cancer over someone not so exposed. While Dr. Schwartz testified that Decedent-Employee's tumor had likely been growing for at least three years or longer and exposures during those three years would not have contributed to it, he stated on cross-examination by Defendant Fireman's Fund that there was no way to determine definitively when the tumor started growing. He also testified that hexavalent chromium did not cease to be a carcinogen after the cancer had developed.
28. On cross-examination by Defendant Travelers, Dr. Schwartz testified that he has not done any principal research or publication on issues related to this case. However, he has a working knowledge of hexavalent chromium consistent with the expertise of an occupational medicine physician. Dr. Schwartz agreed that it was possible that there could be a threshold associated with the carcinogenicity of a compound, but only if the body is able to neutralize it *Page 17 
before any damage is done. Dr. Schwartz indicated in his cross-examination by Defendant Travelers that he had evaluated patients for Plaintiff counsel's firm regarding impairment and disability once a month for two years.
29. Max Costa, Ph.D., was offered as an expert witness by Plaintiff. He has a doctorate in Pharmacology and is a Professor of Pharmacology and Chairman of the Department of Environmental Medicine at New York University Medical School, Director of the Nelson Institute of Environmental Medicine at NYU, and Associate Director for Population Sciences at the NYU Cancer Institute. Dr. Costa's expertise is in heavy metals, nickel and chromium in particular. About 10-15% of his research and publications on heavy metals and human toxicity have focused on hexavalent chromium. Plaintiff tendered Dr. Costa as an expert in Occupational Medicine, Environmental Medicine, Toxicology, and specifically the human toxicity of hexavalent chromium. Defendant Travelers objected to Dr. Costa as an expert in medicine or being allowed to express an opinion on medical causation pursuant to the North Carolina Rules of Evidence. For this case, he reviewed medical reports, blood tests, the hearing transcript, and the depositions of Defendants' experts, Deborah Proctor and Dr. Janet Weiss. He did not have Dr. Schwartz's deposition, but stated that Dr. Schwartz is "an excellent scientist, a good doctor, [and] a good academic physician." Dr. Costa testified that he considers himself to be one of the leading scientists on the toxicology of hexavalent chromium. He testified that he had never heard of Dr. Weiss before receiving her deposition transcript and had never heard of any research by her on hexavalent chromium. He is familiar with Deborah Proctor from chromium litigation in California, as well as news surrounding the "Blue Ribbon Panel" in California that was formed to look into the safe concentration of hexavalent chromium in drinking water. He also noted that Ms. Proctor has only a college degree and, in his opinion, cannot be considered a *Page 18 
leading scientist in the field. He differed with Ms. Proctor's risk assessment in this case and her determinations of the concentrations of chromium to which Decedent-Employee was exposed. Dr. Costa testified that the information he was provided was sufficient to allow him to render opinions in this case. The important factors in his opinion were Decedent-Employee's exposure while cleaning out the chrome seal vestibule and from the paint that contains hexavalent chromium. With regard to whether a paint particle was of a size that could make its way into the lungs, Dr. Costa referred to studies of painters getting hexavalent chromium in their lungs and painters using chromium-based paint who had a higher incidence of lung cancer. He stated that the articles indicated that, although the particle size is large and would be deposited in the upper airways, some of the backspray under high pressure can reach a small size that would go deeper into the lungs. With regard to the air sampling performed at Defendant-Employer, Dr. Costa did not believe testing had been done in the chrome seal vestibule and did not know if the testing done in the paint room was performed when the paint machine was on. He also noted that although the industrial hygiene tests were within OSHA's PEL, those limits had been changed in the last 3-4 years from 100 micrograms per cubed meter to 5 micrograms. He opined that even a PEL of 5 micrograms is not a guarantee against cancer. Dr. Costa opined that Decedent-Employee had exposures to hexavalent chromium while working for Defendant-Employer and remarked on the blood test which showed 3-4 times the normal level of chromium, though he noted that it could not be determined whether the chromium in her blood was hexavalent or trivalent chromium without further testing. He opined that the exposure to hexavalent chromium at work would have placed Decedent-Employee at an increased risk of developing lung cancer and, to a reasonable degree of scientific certainty, was a substantial factor in causing her lung cancer. *Page 19 
30. With respect to the deposition of Dr. Janet Weiss, Dr. Costa agreed that the nose and mucus system might filter out insoluble paint particles, but opined that it would be less effective on the liquid from the chrome seal tank. He disagreed with her that chromium is a low potency carcinogen. It is one of the more potent carcinogens known to man. As to her opinion that smoking has a less than additive effect when combined with hexavalent chromium, he noted that studies of chromium refinery workers indicated that the workers who smoke get the most cancers, making smoking an additive factor. He stated that about 15% of lifetime smokers get cancer. He believes that a person occupationally exposed to hexavalent chromium for over 20-30 years would have greater than a 15% chance of getting lung cancer. As to the issue of a threshold related to hexavalent chromium exposure and lung cancer, Dr. Costa agrees that there probably is a threshold for anything that can be inactivated and it would be dependent on the dose. He disagrees that smoking would be a significant source of hexavalent chromium, though it does contain trivalent chromium. Overall, in contrast to Dr. Weiss, he opined that it was not accurate that Decedent-Employee had no more exposure to hexavalent chromium than someone walking down the street. Dr. Costa testified that Decedent-Employee's last four years at Defendant-Employer were relevant to ascertaining causation in that additional exposure may have contributed to the extent of her cancer. Even Dr. Weiss testified that if hexavalent chromium is not reduced to trivalent chromium outside of a lung cell and is actually reduced while it is in a lung cell, it has the capacity to generate reactive species that then can potentially damage the DNA and if it is not repaired that can potentially develop into cancer. She testified that it could damage DNA by causing cross-linking or DNA annex, or DNA protein annex. In addition, hexavalent chromium can damage the macro molecules in the cell and damage proteins in the cell and make them not work. *Page 20 
31. As to Deborah Proctor's deposition, Dr. Costa testified that her comments about the chrome seal solution not being heated did not affect his opinions. Dr. Costa assumed she meant that without heat, there would be less vapor in the vestibule. However, he opined that there was still enough hexavalent chromium in the vestibule when Decedent-Employee went in to clean it and got it on her clothes and skin and in her nose and throat that she had some inhalation exposure. Notably, Decedent-Employee, Dorothy Blake, Tony Bollinger, and Brian Creed all testified that there was a mist or fog in the chrome seal vestibule when it was entered for cleaning. None of Defendants' witnesses from Defendant-Employer disagreed with this testimony. In fact, Timothy Ballard testified that the vapor in the chrome seal vestibule was created as the nozzles sprayed the solution, though he estimated that it took five minutes or so to dissipate.
32. Defendants contend that Dr. Costa had a misunderstanding as to what percentage of the chrome seal solution was hexavalent chromium. Review of his testimony does indicate that he believed the percentage to be about 25%, whereas other evidence consistently indicated that it was much lower. While this misunderstanding does affect the quality of his opinion as to that issue, it does not undermine his opinion regarding Decedent-Employee's exposure via the paint, the qualities and hazards of hexavalent chromium in general, or the significance of Decedent-Employee's blood test results.
33. Dr. Costa stated that he does litigation consulting off and on and it comprises about 10% of his income. He works mostly for plaintiffs. He had no prior acquaintance with Plaintiff's counsel before being contacted about this case.
33. On cross-examination by Defendant Travelers, Dr. Costa stated that he did not do a risk assessment for Decedent-Employee. He does not specialize in risk assessment, but he did *Page 21 
not believe that an accurate one could be done without information about the exposure in the chrome seal vestibule. He does not agree with Dr. Schwartz that the last few years of Plaintiff's exposure were not relevant to her cancer. Dr. Costa agreed that smoking was a factor in Decedent-Employee's cancer and stated that both smoking and hexavalent chromium were substantial factors in contributing to Decedent-Employee's lung cancer. When confronted with studies showing that cigarette smoke contained hexavalent chromium, Dr. Costa asked for the concentration per those studies and used it to calculate a possible 1.5 milligram exposure for Decedent-Employee over her lifetime, which he testified was less than a person would get from air. Therefore, he opined that smoking was not significant as a carcinogen from hexavalent chromium. He agreed that smoking is a larger factor in causing cancer, but stated that hexavalent chromium did pose a risk of causing cancer as well.
34. On redirect and recross examination, with regard to the studies involving painters using paint containing hexavalent chromium, Dr. Costa agreed that he could not compare the spraying equipment used with that used by Defendant-Employer. However, he testified that the study results were important because they showed that paint containing hexavalent chromium could make its way into the lungs.
35. Defendants offered Dr. Janet Weiss, a medical and environmental toxicologist, as an expert witness. Dr. Weiss is board-certified in preventive medicine, medical toxicology, occupational environmental medicine, toxicology, pathology, and anatomic pathology. She currently serves in faculty positions at the University of California at Berkley and the University of California at San Francisco. Dr. Weiss stated that she had read 200 to 300 articles on hexavalent chromium over the years and had consulted with OSHA and taken part in investigating chrome plating companies that were eventually closed. Dr. Weiss discussed issues *Page 22 
relating to latency and stated that the epidemiologic studies on hexavalent chromium estimate a cancer latency period of between 27 and 36 years, which is in excess of the approximately 20 years that Decedent-Employee worked for Defendant-Employer. Dr. Weiss discussed the reducing capacities of the lung to metabolize hexavalent chromium and detoxify it. Because hexavalent chromium is very soluble, there are parts of the lung that will reduce toxic hexavalent chromium to the non-toxic trivalent chromium. Dr. Weiss also conducted a literature search on the combined effects of cigarette smoke and hexavalent chromium and found that there is a less than additive effect between exposure to cigarette smoke and exposure to hexavalent chromium in the occupational context. In fact, there is the suggestion that smokers developed macrophages at an increased rate compared to non-smokers and these macrophages helped reduce toxic hexavalent chromium to the non-toxic trivalent type. Further, she testified that approximately 80% to 90% of lung cancers are attributable to cigarette smoke, whereas hexavalent chromium is a relatively low potency carcinogen. Dr. Weiss went on to state that cigarette smoke was a source of hexavalent chromium and that other sources are found in soil, coal burning, stainless steel pipes, and food stuffs such as grains, vegetables, and shellfish. She also noted that Decedent-Employee took VitaTrum which contains 120 ug of chromium picolinate per tablet, which she believed would impact serum levels of chromium.
36. Dr. Weiss reviewed the hearing transcript and exhibits. She reviewed the industrial hygiene data and found that the hexavalent chromium levels in the paint room were very, very low, meaning that there was very efficient ventilation there and throughout the plant. She noted that a personal air sample was taken specifically on Ms. Blackburn and measured at less than .4 ug/m[3]
or "non-detectable." In other words, the limitations on detection of the analytic method utilized by the industrial hygienist could not pick it up. Dr. Weiss testified that *Page 23 
in the process of pouring a beaker of Phosgard into a 420-gallon tank, at ambient water temperatures, there would not be any expected volatilization of the hexavalent chromium component of the compound.
37. Dr. Weiss conducted a site visit to Defendant-Employer's plant. She knew that there was a description by employees that characterized the environment in the chrome seal vestibule as misty or humid and that they got liquid on their suits. She also was aware that they wore gloves, boots, and head coverings. Dr. Weiss opined that the droplets that would be created in a 100% humid environment as the individuals described it would produce non-respirable sized droplets in the 10 to 50 micron size, which would be cleared through the nose and would not get into the lungs. Furthermore, the solution used in the chrome seal stage was extraordinarily dilute. In her opinion, Decedent-Employee's exposure could never reach the PEL. She described the potential exposure in the chrome seal vestibule as being an immeasurably low or miniscule. Dr. Weiss further stated that the unpleasant odor in the paint room most likely came from the epoxy resins, the glycol ether background, and/or the PGMEA.
38. With respect to blood sampling protocol for chromium, Dr. Weiss noted that several factors can affect the accuracy of the results. In particular, she stated that the skin must be adequately scrubbed and the needle used must not be stainless steel, which contains chromium. However, there was no testimony or evidence that the heavy metal tox screen ordered by Dr. Harpole at Duke University Medical Center was not performed properly.
39. On the basis of her evaluation of Decedent-Employee's exposure during her employment, she concluded that her total cumulative exposure was less than 5 ug/m[3] years. This conclusion is based on the testing done in the workplace and her opinion of the limited bioavailability of hexavalent chromium to Decedent-Employee in her work in the pre-treatment *Page 24 
tanks. She was also of the opinion that this level of exposure did not significantly contribute to the development of Decedent-Employee's lung cancer.
40. Dr. Weiss did not agree with the other doctors as to the cause of Blackburn's lung cancer, but she did agree that the kind of lung cancer Decedent-Employee had, adenocarcinoma, is the kind that is caused by exposure to hexavalent chromium. She felt that the hexavalent chromium contributed to the lung cancer but only minimally. While Dr. Weiss visited the Stabilus plant, she did so only after the hexavalent chromium phased out. She also believed that Decedent-Employee had worn protective clothing that was impervious to liquids throughout her career. In fact, Sheila Higgins, the safety manager at Defendant-Employer from January 2000 to February 2001, testified that suits that were impervious to liquids were not available until 2000. Additionally, Dr. Weiss's findings deviate from the warnings of the manufacturer as evidenced by labels on the Phosgard. Finally, Dr. Weiss's opinions that the chrome seal solution was very dilute and did not pose an exposure risk was inconsistent with the testimony of Defendants' witness Michael Ellington, who testified that the chrome seal solution was a hazardous waste and had to be treated chemically to eliminate the hazards of hexavalent chromium in the solution before it could be disposed.
41. Defendants also offered Deborah Proctor as an expert witness in the field of epidemiology and risk assessment associated with hexavalent chromium in particular. Deborah Proctor is a principal scientist with the Exponent Health and Environment section of Exponent, Inc., in Irvine, California. Ms. Proctor has an undergraduate degree from the University of California at Davis in environmental toxicology. She specializes in hexavalent chromium and has done numerous research projects over 18 years. Her specialty is risk assessment, which involves quantification of exposure, the evaluation of potential hazards, and a characterization of *Page 25 
the risks associated with the relationship between dose and response. Ms. Proctor testified that she is familiar with all of the medical literature and epidemiological literature relating to risks associated with human and animal exposure to hexavalent chromium. Her research is almost always funded by companies who are defendants in litigation over hexavalent chromium or who are involved in clean up actions involving hexavalent chromium.
42. To complete her evaluation in this case, Ms. Proctor reviewed the industrial hygiene data from Defendant-Employer, Decedent-Employee's work history, her medical history, pathology reports, pictures that were introduced into evidence in the case, the testimony of Decedent-Employee and other employees, and the depositions of Drs. Frank and Schwartz. She sought to quantify the exposure from the time Decedent-Employee started at the facility until she left to calculate a cumulative dose over the duration of her tenure. Ms. Proctor calculated Decedent-Employee's cumulative exposure as approximately 4 micrograms/m[3] years as a cumulative work life dose. She then used a unit risk factor to assess the risk estimate for lung cancer in Decedent-Employee due to her hexavalent chromium exposure. She determined that the risk was 2 in 10,000, which is not increased above background. Ms. Proctor stated that she took into account the cleaning of the pre-treatment system, but admitted that she had no data from the chrome seal vestibule or tank. Ms. Proctor did not think it was likely that Ms. Blackburn received a significant exposure while doing that part of her job because that activity suggested that there were large water droplets that she got on her suit and got on her mask, which were not of a particle size that could be inhaled into the lung. However, this opinion appears inconsistent with the warning labels on the Phosgard 748 container regarding exposures to mists. Ms. Proctor acknowledged, however, that she may have received a small amount of additional exposure during that task. *Page 26 
43. Ms. Proctor had an opinion to a reasonable degree of scientific and epidemiological certainty in the field of risk assessment that the exposure that Decedent-Employee had during her employment with Defendant-Employer was far below the levels which have been associated with an increase in lung cancer risk in the epidemiological literature and she did not believe that hexavalent chromium exposure contributed significantly to the risk of developing lung cancer. Ms. Proctor also performed a risk assessment of the lung cancer risk that would be associated with Decedent-Employee's cigarette smoking. Using the Bach model that has been approved and used by clinicians in assessing the risk of developing lung cancer from cigarette smoke, Ms. Blackburn's risk was calculated to be 9 in 100. According to Ms. Proctor, 99.6% of the total risk from the two exposures would be assigned to cigarette smoking and 3/10 of 1% assigned to hexavalent chromium. Based on the mechanistic data regarding reduction of hexavalent chromium to trivalent chromium in the lungs, Ms. Proctor was of the opinion that there is a threshold associated with exposure to hexavalent chromium and the development of lung cancer. Ms. Proctor opined that Decedent-Employee's lung cancer was primarily due to smoking and that hexavalent chromium was a minimal contributor.
44. When questioned about her involvement in chromium-related litigation in California and with a "Blue Ribbon Panel" appointed to review the public health goal for chromium in the drinking water, Ms. Proctor's responses were often vague or professed an inability to recall events.
45. Hexavalent chromium was present in the paint until July 2004 and in the pre-treatment system until December 2004.
46. After a careful review of the expert witnesses' testimony, the Full Commission assigns greater weight to the opinions of Drs. Frank, Schwartz, and Costa. Drs. Frank, Schwartz, *Page 27 
and Costa have excellent education and credentials. To the extent that Dr. Costa is not a medical doctor, it is noted that his scientific opinions regarding Plaintiff's exposure and the effects of exposure to hexavalent chromium in general are valuable and supportive of the opinions of Drs. Frank and Schwartz. The opinion of Dr. Harpole regarding the possible contribution of hexavalent chromium exposure to Decedent-Employee's lung cancer is also considered supportive. With respect to Defendants' witnesses, the opinion of Deborah Proctor is accorded little weight based on her level of education and the fact that her research on hexavalent chromium is funded primarily by private industry and trade associations. While Plaintiff's experts all consult in litigation primarily for plaintiffs, the evidence indicated that they perform independent research and practice (with the exception of one literature review that Dr. Costa performed which he admitted was funded by a plaintiff firm). In contrast, Ms. Proctor's research is funded primarily by the same industry for which she consults. Moreover, Ms. Proctor's testimony regarding issues of past events relating to conflicts of interest was vague. Dr. Weiss's credentials and relative independence are creditable. However, her testimony is undermined by her statement that she found the work of Ms. Proctor to be excellent and the seemingly incredible statement that Decedent-Employee was not exposed to any more hexavalent chromium in her job with Defendant-Employer than she would have been walking down the street.
47. Decedent-Employee's job duties remained the same until three to four months prior to the time she left the facility in or about early 2005. There was no evidence establishing that Decedent-Employee's working conditions, including the ventilation and personal protective equipment provided, were significantly upgraded during Decedent-Employee's employment such that her exposure to hexavalent chromium was reduced. *Page 28 
48. Based on the greater weight of the competent and credible evidence, the Full Commission finds that Decedent-Employee was exposed to hexavalent chromium in her employment with Defendant-Employer such that she was placed at an increased risk of contracting lung cancer over that of the general public not similarly employed. Notwithstanding Plaintiff's cigarette smoking history, the exposure to hexavalent chromium in her workplace was a significant contributing factor to her development of lung cancer.
49. Based on the greater weight of the competent and credible evidence, the Full Commission finds that Decedent-Employee was exposed to the hazards of hexavalent chromium-related lung cancer through the last day Defendant-Employer used hexavalent chromium in 2004.
50. During the period of Decedent-Employee's employment, Defendant-Employer had three different insurance carriers, as stipulated above. On the issue of last injurious exposure, the evidence establishes that Decedent-Employee was exposed to hexavalent chromium until Defendant-Employer ceased using it in 2004.
51. The Full Commission further finds that the carrier on the risk upon Decedent-Employee's last day of exposure to the hazards of hexavalent chromium-related lung cancer was Defendant-Carrier Travelers.
52. The Form 22 submitted by Defendants indicated that Plaintiff earned $41,591.41 in the 52 weeks immediately preceding her date of injury. This results in an average weekly wage of $799.83 and yields a compensation rate of $533.25. However, Defendant-Employer did not submit its Form 22 until on February 10, 2010, two weeks before the Full Commission hearing of this matter, though the claim was filed in 2005. Plaintiff has not had an opportunity to present evidence or cross-examine the Form's preparer on this issue. *Page 29 
53. Given the uncommon and complex nature of the occupational disease alleged by Decedent-Employee/Plaintiff, the Full Commission finds that Defendants' defense of this claim was not unfounded or based on unreasonable litigiousness.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of her employment with Defendant-Employer, Decedent-Employee developed the occupational disease of lung cancer from exposure to hexavalent chromium. Decedent-Employee's work at Defendant-Employer placed her at an increased risk for developing lung cancer as compared with the public generally and her work at Defendant-Employer made a significant contribution to the development of her lung cancer. N.C. Gen. Stat. § 97-53(13),Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
2. In any case where compensation is payable for an occupational disease, the employer in whose employment the employee was last injuriously exposed to the hazards of such disease shall be liable. N.C. Gen. Stat. § 97-57. Last injurious exposure is "an exposure that proximately augmented the disease to any extent, however slight." Haynes v. Feldspar Producing Company,222 N.C. 163, 166, 169, 22 S.E.2d 275, 277-278 (1942). The occupational exposure does not have to cause or significantly contribute to the disease or significantly worsen the condition. It only has to augment the disease to any extent, however slight.Rutledge, supra.
3. In Caulder v. Mills, 314 N.C. 70, 331 S.E.2d 646 (1985), the Court concluded that "hazard" should be given its ordinary meaning. "`Hazard' is defined by Webster's Third New International Dictionary 1041 (1976) as `a thing or condition that might operate against success *Page 30 
or safety: a possible source of peril, danger, duress, or difficulty . . . a condition that tends to create or increase the possibility of loss.'" Id. at 75, 331 S.E.2d at 649.
4. Where there is only one employer, but two or more carriers, the carrier on the risk at the time of last injurious exposure is liable. Jones v. Beaunit Corp.,72 N.C. App. 351, 324 S.E.2d 324 (1985).
5. The greater weight of the competent evidence establishes that Decedent-Employee's last injurious exposure occurred during Defendant Travelers' coverage period, which lasted from October 1, 2003 through the last day of Plaintiff's employment in early 2005. Therefore, Defendant Travelers is the responsible carrier and is, therefore, liable for payment of compensation owed to Plaintiff. N.C. Gen. Stat. § 97-57.
6. Prior to her death, Decedent-Employee was totally disabled as a result of her occupational disease and entitled to temporary total disability compensation from the date of her last day of employment with Defendant-Employer to her date of death. N.C. Gen. Stat. § 97-29.
7. Decedent-Employee's estate is entitled to reimbursement for all medical treatment resulting from her compensable occupational disease to the extent that such treatment was designed to effect a cure, give relief or lessen the period of disability. N.C. Gen. Stat. § 97-25.
8. Decedent-Employee's compensation rate cannot be determined at this time and the matter should be held open only for the gathering of evidence on this limited issue for review by the Full Commission.
 *********** ORDER
IT IS HEREBY ORDERED that this matter is referred to Chief Deputy Commissioner Wanda B. Taylor to be placed expeditiously on a hearing docket for the taking of additional *Page 31 
evidence solely on the average weekly wage issue. The parties shall have 30 days following the closing of the record to submit briefs, after which the Deputy Commissioner shall return all evidence gathered to the Full Commission to review and make findings of fact and conclusions of law.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants Stabilus and Travelers shall pay to the Estate of Gail Blackburn temporary total disability compensation at the rate to be determined beginning February 4, 2005, and continuing until the date of her death on March 7, 2009. This compensation has accrued and shall be paid in a lump sum.
2. Defendants Stabilus and Travelers shall pay all medical expenses that were incurred by Decedent-Employee as a result of the compensable occupational disease that were reasonably required to effect a cure, give relief, and/or lessen plaintiff's period of disability. To the extent that Decedent-Employee incurred out-of-pocket medical payments related to her compensable occupational disease, Defendants Stabilus and Travelers shall reimburse the Estate.
3. Defendants shall indemnify Medicare and any health insurance company for all medical expenses incurred and paid as the result of Decedent-Employee's compensable occupational disease.
4. A reasonable attorney fee in the amount of 25 percent of the compensation approved and awarded to Decedent-Employee's estate is approved and allowed for Plaintiff's *Page 32 
counsel. The attorney's fee shall be deducted from the compensation due the estate and paid directly to Blackburn's attorney.
5. This Award does not address any separate claim filed seeking death benefits.
6. Defendant Travelers shall pay the costs of this action.
This the ___ day of April 2010.
 S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
S/_____________ DANNY LEE McDONALD COMMISSIONER